UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| APPLIED MACHINERY RENTALS, LLC, | ) CASE NO.: 23-30461 |
| | ) CHAPTER 7 |
| Debtor | ) |
| | ) |
| COLE HAYES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF APPLIED MACHINERY RENTALS, LLC, | ) |
| | ) ADVERSARY PROCEEDING |
| | ) NO.: _____ |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HYATT CORPORATION, RANGE DEVELOPMENTS LIMITED, and CHRISTOPHE HARBOUR DEVELOPMENT COMPANY, LIMITED, | ) |
| Defendants. | ) |

## COMPLAINT

Now comes Cole Hayes ("Plaintiff"), through counsel, as the Chapter 7 Trustee for the Bankruptcy Estate of Applied Machinery Rentals, LLC ("AMR" or "Debtor") and shows the Court:

**Parties, Jurisdiction, and Venue**

1. Plaintiff is the duly appointed, acting, and qualified Chapter 7 Trustee for the bankruptcy estate of Applied Machinery Rentals, LLC.

2. Applied Machinery Rentals, LLC is the debtor in the bankruptcy case bearing Case Number 23-30461 ("Bankruptcy Case"), filed on July 17, 2023

("Petition Date"), and pending in the United States Bankruptcy Court for the Western District of North Carolina ("Court").

3. Upon information and belief, Defendant Hyatt Corporation ("Defendant Hyatt") is a business corporation organized and existing under the laws of the state of Delaware with a principal place of business in Chicago, Illinois.

4. Upon information and belief, Defendant Range Developments Limited ("Defendant Range") is a business corporation organized and existing under the laws of the United Arab Emirates with a principal place of business in Dubai and an affiliate of Defendant Hyatt.

5. Upon information and belief, Defendant Christophe Harbour Development Company, Limited ("Defendant CH") is a business corporation organized and existing under the laws of the Federation of Saint Christopher (St Kitts) and Nevis with a principal place of business in Basseterre.

6. Upon information and belief, Defendant Hyatt, Defendant Range, and Defendant CH (collectively, "Defendants") act together to own, operate, and manage the Park Hyatt St. Kitts Christophe Harbour resort located in the Federation of Saint Christopher (St Kitts) and Nevis under the "Park Hyatt" luxury hotel brand.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

8. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

9. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).

2

10. The statutory predicates for relief are 11 U.S.C. §§ 105, 363, 544, 548, and 550, as well as N.C. Gen. Stat. § 39-23.1 *et seq.* and S.C. Code § 27-23-10 *et seq.*

11. Plaintiff commences this action under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

12. Plaintiff consents to the entry of final orders or judgment by this Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

**Factual Background**

13. The Debtor purported to be in the business of acquiring, distributing, leasing, and selling Merlo Telehandlers – an Italian hydraulic machine that is a combination tractor, forklift, and crane boom. The Debtor was previously the exclusive dealer of Merlo equipment in North America.

14. Since its formation, Garth Errol McGillewie Jr. ("Garth") was the sole member, manager, and principal of the Debtor. Upon information and belief, Garth acted as president and CEO of the Debtor and exercised complete and unfettered dominion and control over its affairs and assets.

15. Garth ran the enterprise, which included the Debtor and related entities interchangeably, with the intent to enrich himself and his family at the expense of the Debtor's creditors and, to that end, committed numerous criminal acts in furtherance of the enterprise.

16. Indeed, Garth used the Debtor and its affiliates to operate a Ponzi scheme (the "AMR Ponzi Scheme") from at least 2019 until Garth took his life in

3

2023.[1] He borrowed money from various creditors on false pretenses and used loan proceeds from some creditors to keep others at bay and hide his fraud.

17. On the surface, Garth purported to obtain loans to finance the import and purchase of Merlo Telehandlers. He represented and made assurances to lenders that AMR would purchase and then lease telehandlers to customers and use the lease payments to repay the loans.

18. Garth pledged telehandlers that did not exist and pledged the same telehandlers to multiple lenders representing that each lender had a first-priority lien.

19. Garth also sold the telehandlers "out of trust" to third parties without the lenders' knowledge or consent, and without remitting the sale proceeds to the lenders.

20. A core component of Garth's Ponzi scheme included inducing creditors to purchase telehandlers at well below fair market value and then, without ever taking possession, lease the telehandlers back to AMR to be "leased" to other

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. *Cunningham v. Brown*, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. *See Bear Stearns Servs. Corp. v. Gredd*, 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); *see also In re: Unified Commercial Capital Inc.*, 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly-attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Gredd*, 387 B.R. at 8-10; *see e.g.*, *Donnell v. Kowell*, 533 F.2d 462, 770 (9th Cir. 2008); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); *SEC v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 304 (5th Cir. 2007); *Armstrong v. Collins*, 2010 U.S. Dist. LEXIS 28075, at *63 (S.D.N.Y. 2010).

4

parties. These arrangements were a sham that permitted investors in the AMR Ponzi Scheme to be paid handsome returns.

21. This fiction allowed Garth to create the appearance of solvency and profitability for AMR even though AMR never possessed anywhere near the number of telehandlers or achieved the profitability that Garth represented to AMR's creditors.

22. In reality, Garth ran a Ponzi scheme, using new loans and investments to repay the preexisting creditors and investors who previously bought into his scheme and to divert the cash to his family.

23. Garth used the proceeds to fund an extravagant lifestyle for himself and his family. He used the money AMR received for daily living expenses, numerous luxury vehicles, boats, beach houses, jewelry, expensive vacations, private-jet travel, an airplane, NFL tickets, and an all-around luxury lifestyle.

24. Garth actively concealed his personal use of business funds from his creditors.

25. Garth also used the proceeds to enrich his friends, Matthew "Scott" Diggs and Paul Adkison. Diggs and Adkinson were members of several LLCs whose corporate names include the phrase "Lift-It." Garth, through the Debtor, transferred over $71 million to the "Lift-It" entities, with millions of those funds going to Diggs and Adkison.

26. Diggs and Adkison, along with all the "Lift-It" entities and other parties, are defendants in a civil action filed on June 13, 2025 by First National Bank

5

of Pennsylvania ("FNB") in the United States District Court for the Western District of North Carolina, Case Number 3:25-cv-00410. This Complaint alleges causes of action for Fraudulent Misrepresentations, Fraudulent Concealment, Negligent Misrepresentation, Violation of Racketeering Influenced and Corrupt Organizations Act (18 USC § 1961 *et seq*.), Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1962(d)), Breach of Contract, Breach of Contract (Piercing the Protective Veil), Breach of Guaranty, Aiding and Abetting Fraud, Conspiracy to Commit Fraud, Fraudulence Conveyance (Actual Fraud), and Fraudulent Conveyance (Constructive Fraud).

27. The Lift-It entities were supposed to own – and represented to FNB that they used FNB loan proceeds to purchase and own – the same telehandlers that Garth purportedly was selling, leasing, re-selling, and doing lease-buybacks with through the Debtor.

28. Diggs and Adkison, through the Lift-It entities, represented to FNB that it owned hundreds of telehandlers purchased from AMR. This representation was materially false and made with either fraudulent intent or reckless indifference for the truth. Upon information and belief, they actually owned few–if any–of the telehandlers reported on their balance sheet. Indeed, many of the serial numbers for machines they represented they owned were fake or were for machines owned or encumbered by other parties.

6

29. Garth's criminal behavior masqueraded the fact that the Debtor's liabilities far exceeded its assets for at least four years before the Petition Date, perhaps since inception.

30. For at least four years before the Petition Date, AMR lacked revenue from legitimate business activities to pay its creditors.

31. Garth commingled the funds Debtor received from creditors and investors.

32. From 2019 through 2023, Garth transferred the following funds, belonging to the Debtor, to Defendants ("Transfers").

| Transfer Date | Transfer Amount |
| --- | --- |
| 2022.06.22 | $7,527.42 |
| 2022.06.22 | $12,215.55 |
| 2022.06.22 | $7,527.42 |
| 2022.06.22 | $7,527.42 |
| 2023.01.02 | $47,183.42 |
| **TOTAL:** | **$81,981.23** |

33. The Transfers took the form of payments to Defendants through the use of AMR's American Express credit card. Garth and other authorized card holders used the AMR American Express credit card for personal expenses that had no business purpose and provided no benefit or value to AMR. Nevertheless, AMR paid the American Express charges.

34. Garth or other authorized card holders made each of the Transfers in connection with luxury travel at the Park Hyatt St. Kitts Christophe Harbour resort that served no business purpose of the Debtor and was not necessary to the Debtor's operations.

7

35. The Transfers each were initial transfers of property of the Debtor.

36. Defendants accepted each of the Transfers.

37. Defendants were the initial transferee of each of the Transfers.

38. Upon information and belief, and specifically as it relates to the Park Hyatt St. Kitts Christophe Harbour resort, Defendants conducted business on each other's behalf and each benefited from the other's actions making them jointly and severally liable as the initial transferee or the entity for whose benefit the Transfers were made.

39. Upon information and belief, Defendants did not inquire of Garth or anyone at AMR why the Debtor needed luxury travel.

40. Reasonable inquiry would have put Defendants on notice that Garth was using Debtor funds for personal expenses.

41. The Transfers provided no benefit or value to the Debtor.

42. The Debtor was insolvent from 2019-2023 and became more indebted as time passed.

43. For the period ending December 31, 2019, the Debtor's liabilities exceeded its assets by over $26 million.

44. For the period ending December 31, 2020, the Debtor's liabilities exceeded its assets by over $61 million.

45. For the period ending December 31, 2021, the Debtor's liabilities exceeded its assets by over $78 million.

8

46. For the period ending December 31, 2022, the Debtor's liabilities exceeded its assets by over $123 million.

47. When each of the Transfers was made, the Debtor's liabilities far exceeded its assets.

48. Consequently, upon information and belief, Defendants did not receive the Transfers for value or in good faith.

49. Defendants did not provide value to the Debtor to support the each of the Transfers they received from the Debtor.

50. Each of the Transfers is avoidable and recoverable under sections 544, 548, 550(a), and 551 of the Bankruptcy Code.

51. The Trustee's investigation is ongoing, and the Trustee reserves the right to (i) supplement the information on the Transfers and any additional transfers and (ii) seek recovery of such Transfer and additional transfers.

**FIRST CLAIM FOR RELIEF**
**Avoidance of Transfers - Actual and Constructive Fraud**
**11 U.S.C. §§ 544, 548, 550 & 551; N.C. Gen. Stat. § 39-23.1 *et seq.*; S.C. Code § 27-23-10 *et seq.***

52. Plaintiff incorporates by reference all previous allegations.

53. Under Section 544(b), the Trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under § 502.

54. Under Section 548(a), the Trustee may avoid any transfer of an interest of the debtor in property that occurred within two years of the debtor's bankruptcy filing if (i) the debtor received less than a reasonably equivalent value in

9

exchange for the transfer and was insolvent when transfer was made, or (ii) the transfer was made with actual intent to hinder, delay, or defraud a creditor or officer of the debtor's bankruptcy estate.

55. The Schedules and the Claims Register identify multiple creditors that can serve as the triggering creditor under Section 544(b).

56. Each of the Transfers is a transfer of property of the Debtor to the Defendants.

57. Each of the Transfers was made while the Debtor was insolvent.

58. The Debtor received less than reasonably equivalent value in exchange for each of the Transfers.

59. Each of the Transfers was made with the intent to hinder, delay, or defraud a creditor or an officer of the Debtor's bankruptcy estate.

60. Each of the Transfers was made in furtherance of the AMR Ponzi Scheme and for Garth to use Debtor funds and assets to enrich himself and his family at the expense of Debtor's creditors.

61. At the time of each of the Transfers, Garth was operating the AMR Ponzi Scheme and thus had the actual intent to delay, hinder, and defraud creditors and made the Transfers to delay, hinder, or defraud creditors. Thus, the Transfers were inherently fraudulent and the Trustee may avoid them.

62. The following badges of fraud also are applicable to each of the Transfers and evidence an inherent intent to defraud: (a) Debtor was insolvent when it made each of the Transfers to the Defendants; (b) at the time of each of the

10

Transfers, the Debtor was unable to pay its debts as they came due; (c) at the time of each of the Transfers, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; (d) Debtor did not receive reasonably equivalent value in exchange for each of the Transfers; (e) Debtor concealed one or more of the Transfers; (f) Debtor made each of the Transfers during the same time it was divesting itself of other assets; (g) at the time of each of the Transfers, the Debtor and Garth were engaged in multiple criminal acts intended to defraud creditors, and these acts included the looting of the Debtor's assets for Garth's family's personal gain.

63. The Debtor's estate has been diminished in the amount of the Transfers in the four years before the Petition Date.

64. The remaining assets of the Debtor's estate are insufficient to pay the estate's debts and liabilities.

65. For these reasons, each of the Transfers should be avoided.

66. Plaintiff also is entitled to a judgment against Defendants as the initial transferee, or as the immediate or mediate transferee of an initial transferee, in an amount to be proven at trial.

67. Plaintiff also is entitled to recover the Transfers or their value from Defendants under Section 550.

68. Plaintiff also is entitled to preservation of the Transfers for the benefit of the estate under Section 551.

**SECOND CLAIM FOR RELIEF**
**(In the alternative, Restitution / Unjust Enrichment)**

69. Plaintiff incorporates by reference all previous allegations.

70. In the alternative to the preceding First Claim for Relief as to Defendants, Plaintiff sets forth the following claim for relief for restitution and unjust enrichment as to the Transfer.

71. This claim is asserted as an alternative assuming the statutory remedies in the preceding First Claim for Relief does not provide an adequate remedy at law.

72. The Debtor transferred at least $81,981.23 of Debtor funds to Defendants.

73. The funds Defendants received and accepted from Debtor conferred benefits upon Defendants.

74. It is inherently unfair and inequitable that the funds of other creditors defrauded by Garth are retained and used to personally benefit Defendants rather than being returned to Debtor's estate for the benefit of all the defrauded creditors.

75. As a direct and proximate result of Defendants' retention of at least $81,981.23, the Debtor's estate has been diminished, and under the circumstances, equity dictates that Defendants return the Transfers to the Trustee for the benefit of all the creditors of the estate.

WHEREFORE, Plaintiff prays:

12

1. That on its First Claim for Relief, the Court avoid the Transfers, Plaintiff recover the value from Defendants, jointly and severally, and the Court enter judgment awarding damages to Plaintiff in an amount to be proven at trial;

2. That on its Second Claim for Relief, Plaintiff have and recover judgment against Defendants, jointly and severally, for restitution and unjust enrichment in an amount to be proven at trial;

3. That on each of its Claims for Relief, the Court enter judgment awarding Plaintiff pre-judgment interest, post-judgment interest, and reasonable attorneys' fees to the extent permitted by law;

4. That the Court, if necessary, impose a constructive trust or equitable lien, or both, on all assets traceable to the Transfers; and

5. That the Court grant the Plaintiff such other and further relief as the Court deems just and proper.

This the 11th day of July, 2025.

*/s/ Isabelle M. Chammas*
Lance P. Martin
N.C. State Bar No. 027287
email: docketCR@wardandsmith.com *
email: lpm@wardandsmith.com **
Isabelle M. Chammas
N.C. State Bar No. 58253
email: imchammas@wardandsmith.com **
Ward and Smith, P.A.
Post Office Box 2020
Asheville, NC  28802-2020
Telephone:  828.348.6070
Facsimile:  828.348.6077
*Special Counsels for Cole Hayes, Esq., Trustee*
  *for Applied Machinery Rentals, LLC*

13